UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE LUIS BARRETO-MEJIA,

Petitioner,

- against -

MARK ROYCE,

Respondent.

20 Civ. 2442 (CS) (AEK)

**REPORT AND
RECOMMENDATION**

**TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.**

On February 19, 2020, Petitioner Jose Luis Barreto-Mejia ("Petitioner"), proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his April 21, 2010 judgment of conviction for two counts of course of sexual conduct against a child in the first degree and two counts of endangering the welfare of a child. ECF No. 1 ("Petition").[1] In addition to stating his asserted grounds for habeas relief, Petitioner also requested a stay of this habeas proceeding so that he could exhaust several claims through the filing of a post-conviction motion to vacate the judgment pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL"). Petition at 31. On May 29, 2020, the Court issued an order directing Respondent to "file and serve a response to Petitioner's request for a stay of the proceedings and a response to Petitioner's arguments regarding the timeliness of this petition." ECF No. 7. On July 23, 2020, Respondent filed his responsive papers, in which he argued that (i) the Petition was

---

[1] Pursuant to the prison mailbox rule, *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), a habeas petition is deemed filed as of the date it was given to prison officials for mailing. According to Petitioner, he placed the Petition in the prison mailing system on February 19, 2020. *See* Petition at 23 (all citations to the Petition in this Report and Recommendation are to the page numbers assigned by the Court's Electronic Case Filing ("ECF") system).

untimely and that the time bar could not be overcome, and (ii) that Petitioner was not entitled to a stay of the proceedings. *See* ECF No. 13-1.

For the reasons that follow, I respectfully recommend that the Petition be dismissed as time-barred and that the request for a stay be denied.

## BACKGROUND

Because the Court's analysis is limited to the question of whether the Petition was timely filed, the Court recounts only the procedural history, including the relevant dates, related to Petitioner's criminal proceedings.

### I.     Trial and Sentencing

On October 30, 2009, at the conclusion of a jury trial, Petitioner was convicted of two counts of course of sexual conduct against a child in the first degree and two counts of endangering the welfare of a child. ECF No. 13 ("Resp. Aff.") at 3; *see* ECF No. 14 (Trial Transcript ("Tr.")) 966-69 (citing transcript page numbers).[2] On April 21, 2010, Petitioner was sentenced to consecutive terms of 20 years in prison for each count of course of sexual conduct against a child and concurrent one-year prison terms for each count of endangering the welfare of a child. Resp. Aff. at 3.

---

[2] Because Petitioner's prosecution involved charges of sex crimes against child victims, the Court granted Respondent's motion to file the state court transcripts under seal. *See* ECF Nos. 11, 12; N.Y. Civ. Rights L. § 50-b.

## II.    Post-Sentencing Procedural History

On or about April 21, 2010, Petitioner filed a notice of appeal.  Resp. Aff. at 3[3]; *see* Petition at 24; ECF No. 20 ("Reply") at 3.[4]  Petitioner contends that his family retained the law firm of Pappalardo & Pappalardo ("Pappalardo Firm") to represent him on direct appeal, but that he was never notified of this decision and never consented to it.  Petition at 24; Reply at 3.  A final brief in support of Petitioner's direct appeal was filed by the Pappalardo Firm on May 14, 2012.  ECF No. 13-4.  On appeal, counsel argued that the trial court violated Petitioner's right to confront the witnesses against him by erroneously allowing one of the child victims to testify via two-way, closed circuit television, and that the error was not harmless because the testimony of the other child victim was not credible and the remaining evidence was insufficient to support Petitioner's conviction.  *See generally id.*

On December 19, 2012, the Appellate Division, Second Department affirmed Petitioner's judgment of conviction.  *See People v. Barreto-Mejia*, 101 A.D.3d 1040 (N.Y. App. Div. 2012). On December 20, 2012, the prosecution served the Pappalardo Firm with a copy of the Second Department decision with notice of entry.  ECF No. 13-7.  The Pappalardo Firm did not seek leave to appeal to the New York Court of Appeals within the 30-day time period set forth in CPL § 460.10(5)(a) ("An appeal to the court of appeals from an order of an intermediate appellate court is taken . . . [w]ithin thirty days after service upon the appellant of a copy of the order sought to be appealed . . ."), nor did either the Pappalardo Firm or Petitioner file a motion in the

---

[3] The notice of appeal, which was signed by Petitioner, was stamped received by the Criminal Calendar, Westchester Supreme & County Court, on April 21, 2010, but was stamped filed by the County Clerk, County of Westchester, on April 27, 2010.  *See* ECF No. 13-2 at 7.

[4] All citations in this Report and Recommendation to the Reply (other than to the exhibits to the Reply—as set forth in Discussion Section II.C, *infra*) are to the page numbers assigned by the ECF system.

New York Court of Appeals seeking a *nunc pro tunc* extension of the time to seek leave to appeal, which must be made within one year of the 30-day window set forth in CPL § 460.10(5)(a). *See* CPL § 460.30(1).

According to Petitioner, it was not until sometime in 2017—when he received assistance from another inmate in prison—that he "was able to inquire on the status of his appeal." Reply at 3; *see* Petition at 25-26. At some point, Petitioner learned that his "appeal was denied and that no leave to appeal was filed by appellate counsel." Petition at 25-26.[5]

On March 21, 2017, Petitioner sent a note to the Superintendent of his correctional facility, requesting permission to receive legal papers from his family who were going to be visiting him. ECF No. 13-8 at 1. These documents had been retrieved from the Pappalardo Firm by Petitioner's cousin. *See* ECF No. 13-11. The Deputy Superintendent for Security responded the next day, approving the request. *Id.* at 2. Several months later, in a letter dated July 13, 2017, Petitioner asked the Appellate Division, Second Department for a copy of its decision denying his direct appeal. Petition at 26; ECF No. 13-9. The Appellate Division sent Petitioner a copy of the decision and "informed him how to file a leave to appeal application." Petition at 26; ECF No. 13-10 (July 21, 2017 letter from the Appellate Division, Second Department Clerk's Office to Petitioner).[6] Thereafter, in a *pro se* motion dated August 8, 2017, filed in the

---

[5] The record is unclear as to exactly when in 2017 Petitioner learned about the status of his appeal, but it may have been as early as January 2017. In an affidavit dated October 3, 2017, filed in connection with Petitioner's *pro se* application to the Appellate Division for leave to appeal to the New York Court of Appeals, he stated that he "approached his friend assisting him in his legal work on or about January 2017, with tears in his eyes to please help him with his legal work. After the assistant looked at his papers and also in the law library computer, he found out that his appeal was denied a couple of years before." ECF No. 13-14 at 1.

[6] Around this time, Petitioner wrote to the Pappalardo Firm to express frustration with the handling of his appeal and to request certain materials:

Appellate Division, Second Department, Petitioner sought leave to appeal to the New York Court of Appeals the denial of his direct appeal. ECF No. 13-12. In a decision and order dated December 14, 2017, the Appellate Division denied Petitioner's leave application. ECF No. 13-16.

Approximately one year later, by papers dated December 19, 2018, Petitioner filed a petition for a writ of error *coram nobis* in the Appellate Division, Second Department, asserting

---

Sir I am writing you because you represented me in my direct appeal to the Appellate Division Second Department.

As you may remember that I did no [*sic*] speak any English during the time you made my appeal and until now it is very limited, and also my family who contracted you to represent me in my case. As such, making it very hard for us to understand the details of my case and procedures, since we do not know about the law, we had to be informed of filing a leave to appeal.

When my family hired Pappardo & Pappardo, LLC [*sic*] to represent me on my direct appeal, I did not hear from anyone at this firm.

On or about March of 2017, my cousin retrieved some documents from your firm. After someone at the law library reviewed the documents that I received, I was told that a _____, [*sic*] prepared my direct appeal, but it was not filed. I was then informed that you, Mr. John P. Devaney, Esq. filed a similar brief with the Appellate Division.

Please take notice that you have never contacted me concerning my appeal, nor did you serve me with a copy of my appeal brief, nor for that matter ever consulted with me concerning any issues I might have wanted to raise.

I was further informed that my direct appeal was denied. You did not serve me with a copy of this decision and then I was informed that you did not file a leave to appeal application to the Court of Appeals nor did you send me a copy of all my trial transcripts. As such, why did you not file a leave to appeal, which is just a one page simple letter? Also I would like you to send me a copy of the contract and a copy of my trial transcript that my family also paid for.

ECF No. 13-11.

various claims of ineffective assistance of appellate counsel.  ECF No. 13-18.  On October 2, 2019, the Appellate Division denied the petition for a writ of error *coram nobis.  People v. Barreto-Mejia,* 176 A.D.3d 729 (N.Y. App. Div. 2019).  Petitioner sought leave to appeal in the New York Court of Appeals, ECF No. 13-20, which was denied on January 30, 2020, *People v. Barreto-Mejia,* 34 N.Y.3d 1126 (2020).

Petitioner filed the Petition at issue here on February 19, 2020.  ECF No. 1.

**DISCUSSION**

## I.      Standard of Review

"Habeas review is an extraordinary remedy."  *Bousley v. United States*, 523 U.S. 614, 621 (1998) (citing *Reed v. Farley*, 512 U.S. 339, 354 (1994)).  To be granted a writ of habeas corpus from a federal district court, a petitioner must fully and carefully comply with the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C §§ 2244 and 2254.  If a petitioner has met these threshold requirements, a federal district court may hear "an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA imposes a one-year limitations period for the filing of a federal habeas petition.  28 U.S.C. § 2244(d)(1).  This limitations period begins to run from the latest of four possible dates: (1) the date on which the judgment of conviction becomes final by the conclusion of direct review or the expiration of the time for seeking such review; (2) the date on which a

6

government-created impediment to filing a habeas petition is removed; (3) the date on which the constitutional right asserted is initially recognized by the Supreme Court, if the right has been made retroactively applicable to cases on collateral review; or (4) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. *See* 28 U.S.C. § 2244(d)(1)(A)-(D).

Section 2244(d)(2) tolls the one-year limitations period for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2).  A state post-conviction or collateral review application that is filed after the statutory limitations period has expired, however, does not reset the one-year clock. *See Moise v. Fields*, No. 19-cv-11964 (VSB) (RWL), 2021 WL 5316133, at *5 (S.D.N.Y. Sept. 20, 2021), *adopted by* 2021 WL 6133992 (S.D.N.Y. Dec. 29, 2021).[7]  Thus, the tolling provision of Section 2244(d)(2) is applicable only if a petitioner's post-conviction motion was pending within the one-year limitations period for the filing of a federal habeas petition.

In "rare and exceptional circumstance[s]" a court can equitably toll the AEDPA limitations period, allowing a petition filed outside of the one-year limitations period to be considered timely. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (*per curiam*) (cleaned up). To be eligible for equitable tolling, a petitioner must show that (1) extraordinary circumstances prevented him or her from filing the petition on time, and (2) the petitioner acted with reasonable

---

[7] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, copies of this case and other cases that are unpublished or only available by electronic database are being simultaneously mailed to the *pro se* Petitioner along with this Report and Recommendation.

diligence throughout the period he or she seeks to toll. *Id.*; *see Holland v. Florida*, 560 U.S. 631, 649 (2010).

The United States Supreme Court also has held that a claim of actual innocence may provide an "equitable exception" to the AEDPA limitations period. *McQuiggin v. Perkins*, 569 U.S. 383, 386, 392-93 (2013). This exception creates a "gateway" to habeas review despite expiration of the statute of limitations and requires a petitioner to make the same showing of actual innocence necessary to overcome a procedural bar to habeas review that was articulated in *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006). *See McQuiggin*, 569 U.S. at 386. Thus, "a claim of actual innocence must be both 'credible' and 'compelling.'" *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012). To be "credible," an actual innocence claim "must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting *Schlup,* 513 U.S. at 324 and citing *House,* 547 U.S. at 537). For such a claim to be "compelling," "the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him [or her] guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Id.* (quoting *House*, 547 U.S. at 538).

## II.     Timeliness and Tolling

The record in this matter demonstrates that the Petition was not timely filed, and Petitioner is not entitled to statutory tolling. In addition, Petitioner has failed to demonstrate either his entitlement to equitable tolling of the statute of limitations, or a claim of actual innocence that could serve as an equitable exception to the statute of limitations. Accordingly, the Petition should be dismissed as time-barred.

A.      **The Petition Was Not Timely Filed and Petitioner**
        **Is Not Entitled to Statutory Tolling**

1.      **The Petition is Untimely**

As noted above, a one-year statute of limitations applies to the filing of federal habeas petitions; here, that period began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  The Appellate Division denied Petitioner's direct appeal and affirmed his judgment of conviction on December 19, 2012.  *People v. Barreto-Mejia*, 101 A.D.3d 1040 (N.Y. App. Div. 2012).  On December 20, 2012, the prosecution served the Pappalardo Firm with a copy of the decision and notice of entry.  ECF No. 13-7.  Neither the Pappalardo Firm nor Petitioner proceeding *pro se* filed an application for leave to appeal in the New York Court of Appeals within the 30-day time period provided by statute, *see* CPL § 460.10(5)(a) (defendant must file application for leave to appeal "within thirty days after service upon the appellant of a copy of the order sought to be appealed"), nor did either the Pappalardo Firm or Petitioner proceeding *pro se* file a motion in the New York Court of Appeals seeking a *nunc pro tunc* extension of the time to seek leave to appeal, *see* CPL § 460.30(1) (motion for extension of time to file leave application "must be made with due diligence after the time for the taking of such appeal has expired, and in any case not more than one year thereafter").  Petitioner's judgment of conviction therefore became final on January 22, 2013 (January 20 was a Sunday, and January

9

21 was a holiday),[8] and the AEDPA one-year limitations period expired one year later, on January 22, 2014.  Petitioner did not file the Petition until February 19, 2020, more than six years after the expiration of the one-year limitations period.  Accordingly, unless the statute of limitations was tolled or the equitable exception to the statute of limitations applies, the Petition is time-barred.

### 2.    The Limitations Period Was Not Statutorily Tolled

Under the AEDPA, "[t]he time during which a properly filed application for state post-conviction or collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).  Petitioner filed a petition for a writ of error *coram nobis* on December 19, 2018, but "[i]n order to toll the statute of limitations, a state court collateral motion must be pending *during* the limitations period; a state court collateral action filed after the period has expired has no tolling effect." *Moise*, 2021 WL 5316133, at *5 (emphasis in original).  Because the *coram nobis*

---

[8] District courts in this Circuit have reached different conclusions regarding when a judgment of conviction becomes final for purposes of calculating the AEDPA one-year limitations period where, after denial of a direct appeal by the Appellate Division, a petitioner did not file an application for leave to appeal to the New York Court of Appeals.  Many courts have applied CPL § 460.10(5)(a) and deemed the date on which the judgment of conviction became final to be 30 days from the date on which notice of entry of the Appellate Division's decision was served.  *See*, *e.g.*, *Singh v. Dep't of Corr. Servs.*, No. 13-cv-1158 (JFB), 2014 WL 46646, at *3 (E.D.N.Y. Jan. 7, 2014); *Royal v. Lee*, No. 11-cv-5859 (CS) (GAY), 2012 WL 7009773, at *3 (S.D.N.Y. Dec. 13, 2012), *adopted by* 2013 WL 465331 (S.D.N.Y. Feb. 6, 2013).  Some courts, however, have deemed the date on which the judgment of conviction became final to be 90 days from the date on which notice of entry of the Appellate Division's decision was served, which is the expiration of the time for filing a petition for a writ of certiorari in the United States Supreme Court.  *See*, *e.g.*, *Hilson v. Graham*, No. 17-cv-8861 (ER) (KHP), 2018 WL 7502304, at *3 (S.D.N.Y. July 25, 2018), *adopted by* 2019 WL 1004183 (S.D.N.Y. Feb. 28, 2019).  This difference is immaterial in this case, however, because even if the Court deemed the judgment of conviction to have become final 90 days after service of the notice of entry of the Appellate Division decision denying Petitioner's appeal—*i.e.*, on March 20, 2013—the one-year limitations period would have expired on March 20, 2014, and the Petition still would have been filed almost six years too late.

10

petition was filed almost five years after Petitioner's statutory deadline to file his federal habeas petition, the filing of the *coram nobis* petition did not serve to toll the limitations period. As a result, Petitioner is not entitled to the benefit of any form of statutory tolling.

**B.      Petitioner Is Not Entitled to Equitable Tolling of the Statute of Limitations**

For equitable tolling to apply, Petitioner must show that (1) extraordinary circumstances prevented him from filing the Petition on time, and (2) Petitioner acted with reasonable diligence throughout the period he seeks to toll. *Smith*, 208 F.3d at 17. "The word 'prevent' requires the petitioner to demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his [or her] filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000).

The United States Court of Appeals for the Second Circuit has explained that "[a]s a general matter, [courts] set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling. Whether a circumstance is extraordinary is based not on how unusual the circumstance alleged to warrant tolling is among the universe of prisoners, but rather, how severe an obstacle it is for the prisoner endeavoring to comply with AEDPA's limitations period." *Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011) (cleaned up). "It is exceedingly rare for courts in the Second Circuit to find that extraordinary circumstances exist." *Hernandez v. Khahaifa*, No. 10-cv-6582 (KMK), 2013 WL 3984958, at *13 (S.D.N.Y. July 31, 2013) (cleaned up).

With respect to equitable tolling, Petitioner states in his Reply that

> this case establishes the "rare and exceptional circumstances" necessary to grant Petitioner equitable relief because (1) an attorney, who was

11

suppose[d] to be Petitioner's advocate on his direct appeal did not act as an advocate for Petitioner in any sense of the word and abandoned Petitioner's case without notifying Petitioner; (2) once Petitioner was able to understand and determine that appellate counsel had abandoned his case, he diligently filed several letters, leave application and motions against appellate counsel and then filed his federal habeas petition after the state denied collateral relief; and (3) the fundamental miscarriage of justice exception applies to this case, where, actual innocence, if proved, serves as a gateway through which Petitioner may pass whether the impediment is a procedural bar (*see Schlup v. Delo*, 513 U.S. 298 and *House v. Bell*, 547 U.S. 518) or expiration of the AEDPA statute of limitations, as in this case.

Reply at 7-8.[9]

### 1.   Attorney Abandonment

For purposes of equitable tolling, "attorney negligence may constitute an extraordinary circumstance when it is so egregious as to amount to an effective abandonment of the attorney-client relationship." *Martinez v. Superintendent of Eastern Corr. Facility*, 806 F.3d 27, 31 (2d Cir. 2015) (quotation marks omitted).  But because Petitioner disclaims having retained the Pappalardo Firm to pursue a direct appeal on his behalf, and asserts that he did not consent to his family's efforts to hire the Pappalardo Firm to represent him on direct appeal, *see* Petition at 24; Reply at 3, he cannot now claim "attorney abandonment" as an extraordinary circumstance warranting equitable tolling.  Petitioner never intended to work with these attorneys in the first place, and therefore could not have been expecting those attorneys to do anything on his behalf.  In fact, Petitioner not only denies having ever retained the Pappalardo Firm for his direct appeal,

---

[9] The Court addresses Petitioner's argument that he is entitled to the equitable exception to the AEDPA statute of limitations based on a gateway claim of actual innocence in Section II.C, *infra*.

but there is no assertion anywhere in Petitioner's filings that he retained *any* counsel for the purpose of filing a federal habeas petition.[10]

Ultimately, because there is no indication that Petitioner ever retained an attorney "who was responsible for filing the document for which he seeks to toll the statute of limitations—that is, the habeas corpus petition[,] . . . [Petitioner], not his attorney, was responsible for complying with the one-year deadline." *Samo v. Keyser*, 305 F. Supp. 3d 551, 561 (S.D.N.Y. 2018), *adopted by* 2018 WL 4565143 (S.D.N.Y. Sept. 21, 2018). It was incumbent on Petitioner himself to have acted with diligence, both in inquiring about the status of his direct appeal and in taking steps to prepare and file his habeas petition. *See Joaquin v. Smith*, No. 21-cv-9372 (PAE) (SLC), 2022 WL 18956531, at *6 (S.D.N.Y. Dec. 30, 2022), *adopted by* 2023 WL 2237798 (S.D.N.Y. Feb. 27, 2023). "[T]he party seeking equitable tolling must have acted with reasonable diligence *throughout* the period he [or she] seeks to toll." *Smith*, 208 F.3d at 17 (emphasis added). And yet Petitioner does not appear to have taken any action to pursue any post-conviction relief for many years.

Petitioner's lack of reasonable diligence is made even more manifest by the fact that he acknowledges that his trial attorney told him, after his sentencing, about his right to appeal, and had Petitioner sign a notice of appeal on April 21, 2010, which trial counsel said he would file on Petitioner's behalf. *See* Reply at 3; *see also* Petition at 24 ("Petitioner's trial counsel (Jose Muniz, Esq.) filed a Notice of Appeal from said judgment."); footnote 3, *supra*. In the Reply, Petitioner states that he never received a response from the Appellate Division, Second Department indicating that the appellate court received the notice of appeal. Reply at 3. But

---

[10] At some point—close in time to, but not in connection with, the filing of the Petition—Petitioner did retain counsel, Justin Bonus, Esq., for purposes of preparing his § 440.10 motion. *See* Reply at 13-14.

under the circumstances, it was Petitioner's obligation to make efforts to contact the Appellate Division[11] to find out the status of his appeal. *Cf. Samo*, 305 F. Supp. 3d at 560-61 (petitioner did not act with reasonable diligence when he was aware that his attorney had filed a leave application but took no action to find out the disposition of the application and instead took the position "that he was under no obligation to take any action but instead could simply wait to hear from his attorney as to the disposition of the application").

Finally, even if Petitioner had retained the Pappalardo Firm to handle his direct appeal and the firm had failed to file a leave application following the denial of the appeal by the Appellate Division, that failure would not provide a basis for equitable tolling. Equitable tolling is not warranted where a petitioner "argues that his failure to seek leave to appeal the affirmance of his conviction to the New York Court of Appeals was due to appellate counsel's failure to obey his directive to file a leave request," since "counsel's alleged ineffectiveness did not interfere with petitioner's timely filing of a habeas application within the one-year period following the finality of his conviction." *M.P. v. Perlman,* 269 F. Supp. 2d 36, 39 (E.D.N.Y. 2003); *see also Hilson*, 2018 WL 7502304, at *4 ("Defense counsel's failure to seek leave to file an appeal generally is not an 'extraordinary circumstance' that warrants equitable tolling because it does not interfere with a defendant's ability to timely file a habeas petition within a year after his [or her] conviction becomes final.") (citing cases).

For all of these reasons, Petitioner is not entitled to equitable tolling based on a theory of attorney abandonment.

---

[11] Even if Petitioner was mistaken in his belief that the notice of appeal had been filed in the Appellate Division—his trial counsel, in accordance with CPL § 460.10(1)(a), filed the notice of appeal "with the clerk of the criminal court in which such sentence was imposed," *i.e.*, in Westchester County Court—that does not negate the fact that until July 2017, Petitioner took no action to contact *anyone* to inquire about the status of his appeal.

14

## 2.    Language Deficiency/Ignorance of the Law

Petitioner also suggests in the Petition that his inability to speak or understand English was one of the "extraordinary circumstances" preventing him from timely filing the Petition. *See* Petition at 25-26; *see also* Reply at 2.  But "[a]n inability to speak or understand English has consistently been rejected by courts in this Circuit as a basis to equitably toll the statute of limitations." *Coronel v. United States*, No. 12-cv-8673 (SAS), 2013 WL 765321, at *1 (S.D.N.Y. Feb. 28, 2013) (quotation marks omitted) (citing cases).  "This well-established rule has its roots in *Diaz v. Kelly,* [515 F.3d 149 (2d Cir. 2008),] where the Second Circuit first considered whether language deficiency could qualify as an extraordinary circumstance warranting equitable tolling." *Id.*

The *Diaz* court explained that "the diligence requirement of equitable tolling imposes on the prisoner a substantial obligation to make all reasonable efforts to obtain assistance to mitigate his [or her] language deficiency."  515 F.3d at 154.  There, the petitioners "claimed nothing more than the unavailability of personnel within their prisons who could translate for them during the applicable limitations periods." *Id.*  Because there was "no allegation of any efforts to contact anyone outside the prison who might assist in making [the petitioners] aware, in their language, of legal requirements for filing a habeas corpus petition, nor what efforts were made to learn of such requirements within their places of confinement," the Second Circuit held that the district court properly rejected the petitioners' claims of entitlement to equitable tolling. *Id.*

Here, Petitioner provides no explanation at all for what happened between April 2010, when Petitioner signed the notice of appeal that his Spanish-speaking trial counsel said he would file, and July 2017, when, with the assistance of a fellow incarcerated individual, he wrote a letter to the Appellate Division requesting a copy of its decision.  Petitioner does not explain why

15

he took so long—almost seven years—to obtain language assistance that would help him understand what was happening with his criminal case.  While Petitioner states that he never received confirmation from the Appellate Division, Second Department that the appellate court received his notice of appeal, *see* Reply at 3, he never made any effort either to contact his trial counsel to find out what happened with the notice of appeal, or to obtain assistance from someone else who spoke Spanish with contacting the Appellate Division about the status of his appeal.[12]  And there is nothing in the record at all regarding any efforts over the period from April 2010 to at least January 2017 to seek assistance to understand the legal requirements for filing a habeas petition.

Petitioner thus fails to demonstrate that he made "all reasonable efforts to obtain assistance to mitigate his language deficiency." *Diaz*, 515 F.3d at 154.  And this prolonged period of inaction, particularly when Petitioner knew that his trial counsel was going to file a notice of appeal on his behalf, negates a finding that Petitioner acted with reasonable diligence. *See, e.g., Brandon v. Graham,* No. 10-cv-9174 (VB), 2013 WL 2480246, at *5 (S.D.N.Y. June 7, 2013) ("[P]etitioner offers no explanation as to why he waited approximately two years to inquire into the status of his leave application and, thus, fails to demonstrate that he acted with reasonable diligence." (footnote omitted) (citing cases)); *see also Owens v. Keyser*, No. 18-cv-11638 (PGG) (RWL), 2020 WL 9596014, at *7 (S.D.N.Y. Sept. 25, 2020) ("[L]engthy periods

---

[12] It appears that Petitioner at some point became aware that the Pappalardo Firm handled his direct appeal because a cousin retrieved his legal papers from the Pappalardo Firm in or around March 2017.  *See* ECF No. 13-11 (July 21, 2017 letter to John Devaney, Esq. of the Pappalardo Firm).  But while Petitioner seems to have contacted his family and sought their assistance to retrieve his legal papers in 2017, there is no explanation in the record for why Petitioner never sought the assistance of his family to find out what happened with his notice of appeal in 2010 or to find out what was happening with his case at any other point in time prior to 2017.

16

of inaction do not demonstrate reasonable diligence.") (citing cases), *adopted by* 2021 WL 1948339 (S.D.N.Y. May 13, 2021).

Lastly, to the extent that a claim of lack of knowledge of the legal system and the law is subsumed within Petitioner's claim of a language deficiency, "[t]he law is clear . . . that equitable tolling cannot 'be premised on a litigant's lack of education, *pro se* status, or ignorance of the right to bring a claim.'" *Joaquin*, 2022 WL 18956531, at *6 (quoting *Watson v. United States*, 865 F.3d 123, 133 (2d Cir. 2017)) (cleaned up); *see also Horton v. McCoy*, No. 11-cv-0034 (WMS), 2012 WL 34071, at *5 (W.D.N.Y. Jan. 5, 2012) ("courts have consistently found that circumstances such as indigency, and ignorance of the law and legal procedures, are not sufficiently 'extraordinary' to merit equitable tolling"); *Lewis v. Walsh*, No. 03-cv-1932 (DC), 2003 WL 21729840, at *2 (S.D.N.Y. July 25, 2003) ("[A] lack of knowledge of the law is not in any way rare, extraordinary, or unusual—indeed, it is probably the rule rather than exception among prisoners.").

*     *     *     *     *     *

In sum, none of the circumstances cited by Petitioner constitutes the kind of "rare and exceptional circumstance" that warrants equitable tolling of the AEDPA one-year limitations period. Moreover, Petitioner has made no showing that he acted with reasonable diligence throughout the lengthy period of time that he seeks to toll. Indeed, Petitioner's efforts in filing the leave application in August 2017 came after almost seven years during which he took no action (and during which he claims to have been unaware that the Pappalardo Firm took any action) to pursue his habeas claims. Even then, after his application for leave to appeal was denied in December 2017, and despite being well past the expiration of the limitations period for filing his habeas petition, he took yet another year to file his petition for a writ of error *coram*

17

*nobis*.  It was only after those clams were fully exhausted that he finally filed the Petition.

Petitioner is therefore not entitled to the benefit of equitable tolling.

    **C.**       **Petitioner Has Not Established a Viable Gateway Claim of Actual Innocence**

As part of the Petition, Petitioner requested a stay of this habeas proceeding because he intended to file a motion to vacate his judgment of conviction pursuant to CPL § 440.10. Petition at 31.  As set forth in Section III., *infra*, a stay is not appropriate here because the Petition itself was untimely.  But the Petition listed "Actual and Factual Innocence" as one of the claims Petitioner intended to include in his § 440.10, Petition at 31, and in the Reply, Petitioner states that he was entitled to equitable tolling on the basis of his actual innocence, Reply at 13-18.  Construing these submissions from the *pro se* Petitioner to raise the strongest possible arguments that they suggest, *see Milchamot v. Warden of O.B.C.C.*, No. 25-cv-9892 (LTS), 2026 WL 701029 (S.D.N.Y. Mar. 11, 2026) ("The Court is obliged, however, to construe *pro se* pleadings liberally and interpret them to raise the strongest arguments they suggest.") (cleaned up), the Court analyzes these references to "actual innocence" to be an assertion of a gateway claim of actual innocence, which would serve as an equitable exception to the AEDPA statute of limitations.[13]  Attached to the Reply are three documents constituting some of the evidence that Petitioner said supported the claims he would raise in his § 440.10 motion, including the actual innocence claim.  Reply at 13-14; *see id.* at 21-28 ("Reply Exhibit 1"), 29-31 ("Reply Exhibit 2"), 32-61 ("Reply Exhibit 3").

---

[13] It also appears from the Reply that Petitioner intended to assert a freestanding claim of actual innocence in his § 440.10 motion.  *See* Reply at 19 ("Here, Petitioner has not filed a 'mixed  petition,' instead, Petitioner is seeking a stay of his habeas petition in order to present new and reliable evidence to the state court."), 20 ("Petitioner seeks a stay of the claims that he will raise on his CPL 440.10 motion and permission by this Court, in the event of denial by the State, to amend his petition to add all the claims raised on the 440.10 motion.").

Petitioner described the exhibits as "new evidence" that was "just acquired." *Id.* at 19. Reply Exhibit 1 is a sworn expert report from Dr. Mark L. Taff, a forensic pathologist, dated June 4, 2020. Reply Exhibit 2 is a portion of a sworn affidavit from Dr. Manuel Mota-Castillo, a child and adolescent psychiatrist, dated November 1, 2020.[14] These exhibits were obtained through the auspices of Mr. Bonus, the attorney retained by Petitioner to prepare his § 440.10 motion. *See* footnote 10, *supra*; Reply at 13-14. Reply Exhibit 3 is Petitioner's own affidavit, which was notarized on August 13, 2020. Petitioner states that Mr. Bonus was in the process of trying to obtain another expert report from Dr. Maggie Bruck, a child psychologist, as well as trying to obtain certain audio and video tapes. *See id.* at 19. To the extent that these documents constitute the basis for Petitioner's gateway claim of actual innocence, the Court finds that they

---

[14] Reply Exhibit 2 as filed on ECF is missing pages. A complete copy of the affidavit is included with package of materials submitted to the Court by Petitioner on May 5, 2021. *See* ECF No. 26 at Ex. C (ECF pp. 28-31). As with the state court transcripts, the materials at ECF No. 26 have been filed under seal because they contain the names of the minor victims. *See* footnote 2, *supra*; ECF No. 25.

are not the type of "new reliable evidence" as a result of which "no reasonable juror would find [Petitioner] guilty beyond a reasonable doubt." *Rivas*, 687 F.3d at 541.[15]

In his report, Dr. Taff first noted the evidence that he reviewed: the trial testimony of the victims' mother; the trial testimony of the two child victims; the trial testimony of Margaret Ann Tagliagambe[16]; the trial testimony of prosecution expert Eileen Treacy, Ph.D.[17]; and a "discovery package consisting of legal, medical, laboratory, [and] black-and-white photocopies of scene photos." Reply Exhibit 1 at 1. Dr. Taff described how medical examiners typically conduct injury investigations and how they typically investigate "sexual assault (injury) cases,"

---

[15] In his May 5, 2021 submission, Petitioner reiterated his request for a stay and provided the Court with a copy of a letter sent to the Conviction Integrity Unit of the Westchester County District Attorney's Office by Mr. Bonus. ECF No. 26 at 3 (all citations to specific page numbers in ECF No. 26 are to the page numbers assigned by the ECF system). Mr. Bonus attached to his letter both Dr. Taff's expert report and Dr. Mota-Castillo's affidavit, as well as copies of two medical journal articles, a recording of the 911 call made by one of the child victims (which was not provided to the Court), and the child victims' medical records, which Mr. Bonus contended "were critical and not used by defense counsel." *See* ECF No. 26 at 5. Mr. Bonus also indicated that he had hired Dr. Bruck "to review this file," and added that Dr. Bruck had made a specific request for the videos, which were "critical to her review." *Id.* at 4. In an April 12, 2021 letter to the Court, Petitioner stated that Mr. Bonus had filed an Article 78 petition in state court in order to obtain the videos so that Dr. Bruck could prepare her report. *See* ECF No. 22. If Dr. Bruck ever wrote an expert report regarding Petitioner's case, it has not been provided to the Court. The Court has received no further information regarding either the response of the Westchester County District Attorney's Office to Mr. Bonus's letter or the status of Petitioner's § 440.10 motion.

At bottom, the arguments raised in Mr. Bonus's letter go to questions regarding the lack of physical evidence (a point conceded by the prosecution as explained herein), the child victims' credibility, and the effectiveness of Petitioner's trial counsel—not arguments (or evidence) raising a "compelling" claim of actual innocence such that "no reasonable juror would find [Petitioner] guilty beyond a reasonable doubt." *Rivas*, 687 F.3d at 541.

[16] Ms. Tagliagambe was the pediatric nurse practitioner who conducted the physical examinations of the child victims after they reported the sexual abuse to the police. *See* Tr. 620.

[17] Dr. Treacy testified as an expert in evaluating and treating victims of child sexual abuse. *See* Tr. 722-33.

and he described the investigation conducted with respect to the child victims in Petitioner's case.  Reply Exhibit 1 at 2-4.  In conclusion, he opined only that "[i]n summary, the allegation of sex abuse in these cases *can neither be confirmed nor negated* by the physical examinations and laboratory tests conducted on the complainants."  Reply Exhibit 1 at 6 (emphasis added).

In his affidavit, Dr. Mota-Castillo noted the various pieces of evidence that he reviewed: the victims' mother's testimony; the recording of the 911 call that one of the child victims made; the interview of one of the child victims; Petitioner's "interrogation"; the "deposition" of Ms. Tagliagambe; answers to 20 questions he posed to Petitioner; and medical literature.  ECF No. 26 at 29.  He also "consulted three experienced Ob/Gyn doctors."  *Id.*  Dr. Mota-Castillo then cobbled together a list of "troublesome observations," which were at best tangentially related to his expertise as a child and adolescent psychiatrist, and provided a conclusion that also was at most tangentially related to his expertise as a child and adolescent psychiatrist.  Dr. Mota-Castillo stated only that based on his review of the evidence and his observations, it was his "clinical impression (supported by a review of the current literature[18] and [his] consultations with several Ob-Gyn specialists, that the two victims were not sexually penetrated by [an] adult

---

[18] His affidavit cited a publication from the *Journal of Pediatric and Adolescent Gynecology* that "contains a consensus of the leading experts in the field of child abuse medical assessment," and then noted that he was a "layperson in Ob/Gyn."  ECF No. 26 at 30-31.

male because of the intact hymen, the above-mentioned anal reflex and the fact that they didn't cry at the time of the alleged rape."[19] *Id.* at 31.

"Courts have been wary of finding evidence of actual innocence where supposedly new evidence does little more than provide further evidence of an argument raised at trial." *Marsden v. Colvin*, No. 17-cv-936 (LDH), 2022 WL 4644672, at *7 (E.D.N.Y. Sept. 30, 2022) (quotation marks omitted). At trial, there was extensive direct examination and cross-examination of Ms. Tagliagambe, a prosecution witness and the pediatric nurse practitioner at the Children's Advocacy Center at the Westchester Institute for Human Development, who physically examined the child victims. Ms. Tagliagambe testified that her physical examinations of both children, including her examination of each child's vaginal and rectal areas, and internal vaginal structures, found no abnormalities. Tr. 625-26. Neither child had any injuries. Tr. 626. Ms. Tagliagambe had also reviewed the medical records for physical examinations of the children that had taken place approximately one year earlier, but which had included a look at only the external part of their genitalia. Tr. 626-28. She acknowledged that no injuries were documented in the medical records for those physical examinations. Tr. 629. Ms. Tagliagambe testified that in her expert opinion, she would not expect to see any injury noted in those medical records

---

[19] Dr. Mota-Castillo's affidavit noted the statements of unidentified Ob/Gyn doctors with whom he consulted that it was "highly unlikely" that "a small child would not cry when experiencing the pain that comes with a rape." Reply Exhibit 2 at 2. It is unclear what the source was of Dr. Mota-Castillo's implicit statement that Petitioner's victims did not cry at the time of the alleged rapes. All he stated in his affidavit was that he noted in "the transcript" that "the victims did not report having their mouth covered by [Petitioner]." *Id.* Aside from being unclear to which "transcript" Dr. Mota-Castillo is referring, the fact that the victims did not report having their mouths covered does not mean that they did not cry. Moreover, the victims were not asked at trial whether they cried when Petitioner forcibly engaged in vaginal and anal intercourse with them, but they did each testify that they experienced a lot of pain when he did so. *See* Tr. 300, 302, 304, 306-07, 352 (duplicated at 466), 574, 577. Regardless of whether the child victims in Petitioner's case cried when they were being raped by Petitioner, Dr. Mota-Castillo nowhere explained how that proved Petitioner's innocence.

22

because "the type of training and tools that a pediatrician uses versus a child abuse medical provider uses are very different," and only their external genitalia had been examined; a colposcope was not used. Tr. 629.[20] She added that if the children "had any injury that injury could have healed." Tr. 629.

Ms. Tagliagambe further testified that 95 percent of children who complain of sexual abuse have normal physical examinations, Tr. 629, and that even if a child had suffered vaginal or anal injury, that injury "heals very quickly so a year later you wouldn't see it," Tr. 632. Ms. Tagliagambe stated that in her expert opinion, her examination findings with respect to each of the child victims in August 2008 were consistent with their disclosures of being penetrated both vaginally and anally several times—between November 2004 and August 2007 for the older child, and between March 2006 and August 2007 for the younger child. Tr. 633.

On cross-examination, Petitioner's trial counsel questioned Ms. Tagliagambe in detail about all of the normal findings in her examination reports for the children, as well as the fact that there were no signs of "any acute or chronic injury," all of which Ms. Tagliagambe confirmed. Tr. 634-38. She testified that an absence of injury is still "consistent with the history of vaginal or anal penetration." Tr. 638. When Petitioner's trial counsel asked whether it would surprise Ms. Tagliagambe if a child who was 10 or 11 and had had repeated sexual intercourse with an adult male did not have any tears or abnormalities in the hymen and no discharge, she responded no, it would not surprise her at all. Tr. 641. She acknowledged that in this case, there was "no scientific or medical evidence that shows any type of sex abuse." Tr. 643. She also

---

[20] A colposcope is "a magnifying instrument designed to facilitate visual inspection of the vagina and cervix." Merriam-Webster Dictionary, https://www.merriam-webster.com/ dictionary/colposcope [https://perma.cc/ DDL2-C6YH] (last visited Mar. 19, 2026). During her physical examinations, Ms. Tagliagambe used a colposcope to examine the vaginal and rectal areas of both of the child victims. *See* Tr. 623, 625-26.

23

testified that normal findings—which both victims had here, based on Ms. Tagliagambe's examinations—are as consistent with no sex abuse as they are with sex abuse.  Tr. 643-44.

During his summation, Petitioner's trial counsel highlighted the lack of physical evidence, arguing to the jury that there was "[n]o physical, medical evidence, no scientific evidence of ruptures, of trauma, of lacerations . . ."  Tr. 867.  He later added, with respect to one of the victims:  "[Y]ou look at where is the lesions?  Where are the lacerations?  Where is the scar tissue?  Where is the defacement or deformity of the hymen and she said it was painful."  Tr. 874.  With respect to the other victim, trial counsel noted "[a]ll normal examinations . . . . And I went through with Ms. Tagliagambe, you know, all the different types of lesions and delayed healing and scars, all that stuff that I went through.  Nothing.  It's only five percent.  It's only ten percent . . . .  Twice a week, painful sexual intercourse.  Nothing."  Tr. 878-79.

Thus, both Dr. Taff's report and Dr. Mota-Castillo's affidavit do "little more than provide further evidence of an argument raised at trial," *Marsden*, 2022 WL 4644672, at *7, namely, that there was no physical evidence of the sexual abuse of the child victims in Petitioner's case.  Moreover, their opinions are not inconsistent with the evidence that was presented at trial, and even if they were, "[n]ew evidence that merely conflicts with the evidence presented at trial is insufficient to demonstrate that no reasonable juror, presented with this new evidence would find the petitioner guilty beyond a reasonable doubt."  *Fabers v. Lamanna*, No. 18-cv-2399 (PKC), 2020 WL 1875288, at *23 (E.D.N.Y. Apr. 15, 2020) (cleaned up).  Dr. Taff's report and Dr. Mota-Castillo's affidavit are therefore not "new" evidence sufficient to support a claim of actual innocence.  *See Marsden*, 2022 WL 4644672, at *7 ("The evidence Petitioner now points to . . . offers nothing new, and certainly does not prove Petitioner's innocence.").

24

As to Petitioner's own 29-page affidavit, this also is not "new reliable evidence" sufficient to support a "credible" claim of actual innocence. Petitioner could have testified at trial, but in the affidavit, he blames his trial counsel for not allowing him to do so. *See* Reply Exhibit 3 at 29 ("The lawyer did not allow me to testify nor did he allow me to tell the Judge what really happened to me.").[21] Nonetheless, the affidavit is nothing more than an extended narrative of everything that transpired from the time of Petitioner's arrival in the United States through his sentencing proceeding, providing Petitioner's own self-serving version of events. Aside from the fact that it is questionable whether Petitioner's affidavit is new *reliable* evidence, *i.e.*, a "trustworthy eyewitness account[]," that supports a "credible" claim of actual innocence, it can hardly be said that based on Petitioner's affidavit, he has presented a "compelling" claim of actual innocence such that "no reasonable juror would find [Petitioner] guilty beyond a reasonable doubt." *Rivas*, 687 F.3d at 541; *see also Fabers*, 2020 WL 1875288, at *23 ("New evidence that merely conflicts with the evidence presented at trial is insufficient to demonstrate that no reasonable juror, presented with this new evidence would find the petitioner guilty beyond a reasonable doubt.").

Because Petitioner has failed to demonstrate a viable gateway claim of actual innocence, he cannot avail himself of this equitable exception to the statute of limitations.[22]

*   *   *   *   *   *

---

[21] Notably, it was not until almost ten years after his sentencing—and several years after receiving assistance from another Spanish-speaking inmate—that Petitioner for the first time stated he was going to raise in his § 440.10 motion an ineffective assistance of trial counsel claim based on the denial of his right to testify. *See* Petition at 31.

[22] The Court has received no further evidence in support of this claim and no further information regarding the status of any of his efforts to pursue this claim. S*ee* footnote 15, *supra*.

25

In sum, the Petition was filed long after the expiration of the AEDPA one-year statute of limitations for filing a federal habeas petition; Petitioner is not entitled to statutory tolling because his petition for a writ of error *coram nobis* also was filed long after the AEDPA statute of limitations had expired; and Petitioner has not demonstrated that he is entitled to equitable tolling of, or an equitable exception to, the limitations period.

Accordingly, the Petition is untimely and should be dismissed.

### III.   Petitioner's Application for a Stay

In the Petition, Petitioner sought a stay so that by way of a § 440.10 motion, he could exhaust in state court new claims that were not included in the Petition. *See* Petition at 31. Because the Petition is untimely, however, there is no basis to grant a stay for Petitioner to pursue his claims in state court, as he would not be able to amend the Petition to add any of those claims once they have been fully exhausted. *See Girard v. Superintendent*, No. 17-cv-1002 (TJM), 2018 WL 3579861, at *7 (N.D.N.Y. July 25, 2018) ("[B]ecause his initial habeas petition is untimely, the Court concludes that staying this action and holding the petition in abeyance is unwarranted.") (citing cases).

Accordingly, the application for a stay should be denied.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that the Petition be dismissed as time-barred, and that the application for a stay be denied.[23]  As the Petition presents no questions of substance for appellate review, I respectfully recommend that a certificate of probable cause should not issue. *See Rodriquez v. Scully*, 905 F.2d 24 (2d Cir. 1990) (*per curiam*); *Alexander v.*

---

[23] Because the issue of the Petition's timeliness is dispositive, this Report and Recommendation addresses only that issue and Petitioner's request for a stay.  It does not address the merits of any claims raised in the Petition.

26

*Harris*, 595 F.2d 87, 90-91 (2d Cir. 1979).  I further respectfully recommend that the Court should certify pursuant to 28 U.S.C. § 1915(a) that an appeal from this order would not be taken in good faith.  *See Coppedge v. United States*, 369 U.S. 438 (1962).

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have 14 days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made by mail).  A party may respond to another party's objections within 14 days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any responses to such objections, must be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Cathy Seibel, United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the Honorable Andrew E. Krause at the same address.

Any request for an extension of time for filing objections or responses to objections must be directed to Judge Seibel, and not to the undersigned.

**Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Campbell*, 782 F.3d 93, 102 (2d Cir. 2015).

Dated: March 20, 2026
      White Plains, New York

                              Respectfully submitted,

                              ANDREW E. KRAUSE
                              United States Magistrate Judge

      A copy of this Report and Recommendation has been mailed by Chambers to the *pro se* Petitioner at his address of record on the docket as of the date of the Report and Recommendation, which was confirmed on the New York State Department of Corrections and Community Supervision website. *See Incarcerated Lookup*, Department of Corrections and Community Supervision (last visited Mar. 19, 2026) [https://perma.cc/DG5Y-KJQU].

28